UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF INTERNATIONAL MARINE, L.L.C. AND INTERNATIONAL OFFSHORE SERVICES, L.L.C. AS OWNERS AND OWNERS PRO HAC VICE OF THE M/V INT'L HUNTER PETITIONING FOR EXONERATION FROM OR LIMITATION OF LIABILITY | CIVIL ACTION<br><br>NO: 12-358<br><br>SECTION: "S" (5) |

ORDER AND REASONS

**IT IS HEREBY ORDERED** that the Motion for Partial Summary Judgment filed by International Marine, L.L.C., as owner of the M/V INT'L HUNTER, and International Offshore Services, L.L.C., as owner pro hac vice of the M/V INT'L HUNTER (collectively "International Marine") (Doc. #59) is **DENIED**.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment filed by Linder Oil Company, A Partnership, Linder Energy Company, Louisiana General Oil Company, Sojitz Energy Ventures, Inc., Destin Resources LLC, and Reserves Management, L.C. (collectively "Linder") (Doc. #75) is **GRANTED** as to the punitive damages and loss of consortium claims filed by Lorenzo and Venita Williams and Benjamin Elliot, and the loss of use claims filed by International Marine, and those claims are **DISMISSED WITH PREJUDICE**. The motion is otherwise **DENIED**.

## BACKGROUND

This matter is before the court on a motion for partial summary judgment filed by petitioners in limitation, International Marine, and a motion for summary judgment or, alternatively, partial summary judgment, filed by third-party defendants, Linder.

In 2005, Linder purchased from Chevron an unmanned production platform in West Cameron Block 168 in the Gulf of Mexico. At that time, the platform, the WC 168 #2, protruded twenty-nine feet above the mean high waterline. In September 2005, WC 168 #2 was toppled by Hurricane Rita, and only a small portion remained above the waterline. Linder notified the United States Coast Guard and the Minerals Management Service ("MMS")[1], and marked the obstruction with a bouy. Although Linder did not obtain a permit from the United States Coast Guard for the bouy, the Coast Guard informed Linder in an electronic mail communication that a red bouy with a red light should be placed southward of the toppled platform. Since 2005, the United States Coast Guard has advised mariners in the Local Notice to Mariners of WC 168 #2's sunken position. Since January 2007, Nautical Chart 11341, published by the National Oceanic and Atmospheric Administration, has indicated both an obstruction with an approximate position and a standing platform at the longitude and latitude of WC 168 #2.

On October 22, 2006, when the bouy which marked WC 168 #2 was off station, the M/V LA MARIE allided with WC 168 #2 and sank. Although part of WC 168 #2 was sheared-off in the

---

[1] On June 21, 2010, the MMS was reorganized and renamed the Bureau of Energy Management, Regulation, and Enforcement ("BOEMRE"). Effective October 1, 2011, BOEMRE was reorganized and separated into the Bureau of Ocean Energy Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE").

allision, a dive survey performed after the allision showed that part of it still protruded above the waterline.

On January 26, 2007, the M/V GULF MASTER, struck a submerged object in West Cameron Block 168, which object may have been WC 168 #2.[2]

On June 25, 2008, another dive survey of WC 168 #2 was performed. The surveyors found that part of WC 168 #2 was five feet below the waterline, and there were indications of a fresh impact. Linder's corporate representative, G. Miles Biggs, Jr., admitted at his deposition that something struck the obstruction after the M/V LA MARIE allision, but before the survey was conducted.

On April 7, 2011, the bouy which marked WC 168 #2 was reported missing. Linder hired Production Fire & Safety, LLC to replace the bouy, and Production Fire subcontracted the work to Wet Tech Energy, Inc. On April 9, 2011, Wet Tech installed a new bouy. Wet Tech intended to place the bouy 100 feet south of the location where WC 168 #2 rests five feet below the waterline. However, due to rough seas on the day of the installation, Wet Tech placed the bouy 320.25 feet south of the intended location.

On December 13, 2011, the M/V INT'L HUNTER, which was being operated by Captain William Pennington, headed from West Cameron Block 165 to West Cameron Block 144. Captain Pennington traveled through West Cameron Block 168 at ten knots per hour. Captain Pennington had been through West Cameron Block 168 before, was aware of the location of WC 168 #2, and knew that it was marked with a bouy. He testified at his deposition that he intended to rely on the

---

[2] Linder disputes that the M/V GULF MASTER struck WC 168 #2 because the longitudinal and latitudinal coordinates reported on United States Coast Guard form CG-2692, Report of Marine Accident, Injury or Death, do not precisely match those of WC 168 #2.

bouy's placement to avoid an allision with WC 168 #2. When he approached the area, Captain Pennington passed to the north of the bouy and allided with WC 168 #2. The M/V INT'L HUNTER sank. Captain Pennington testified that he thought that bouys could be passed on any side at the captain's discretion. The four crew members and three passengers boarded life boats and were rescued about an hour after the allision.

The United States Coast Guard immediately notified Linder of the allision. Linder sent an inspection team to WC 168 #2 on December 16, 2011. The inspection team prepared a plat of the area that showed the bouy's position at the time of the allision as being 467 feet from the part of WC 168 #2 that sat five feet below the waterline. Thereafter, the bouy was moved, and a plat of the area dated February 29, 2012, showed the bouy's position as being 202 feet from the part of WC 168 #2 that sat five feet below the waterline.[3]

On February 4, 2012, International Marine filed its petition for exoneration from or limitation of liability in the December 13, 2011, allision in the United States District Court for the Eastern District of Louisiana. Jake Bergeron, a passenger on the M/V INT'L HUNTER, and Lorenzo Williams and Benjamin Elliot, crew members of the M/V INT'L HUNTER, filed claims for their injuries. International Marine filed a third-party complaint against Linder, alleging that Linder was at fault for the allision because it failed to properly mark or remove the obstruction. Williams and Elliot filed punitive damages claims against Linder, and Williams' wife, Venita Williams filed a loss of consortium claim against Linder. Williams and Elliot settled with International Marine. They

---

[3] Five months later, in July 2012, the L/B TRINITY struck WC 168 #2, and sustained severe damage, in an allision that is unrelated to this case.

assigned to International Marine their rights against Linder regarding compensatory damages, but reserved their rights to pursue punitive damages against Linder.

## ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); FED. R. CIV. PROC. 56(c).  If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial.  Celeotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

### B. Maritime Negligence, The Oregon Rule and The Pennsylvania Rule

This case involves the interrelationship between The Oregon Rule and The Pennsylvania Rule, two rebuttable presumptions in admiralty law.  International Marine urges the court to invoke The Pennsylvania Rule, and apply a rebuttable presumption that Linder's failure to remove the obstruction or properly mark it was the sole proximate cause of the allision.  On the other hand, Linder urges the court to invoke The Oregon Rule and apply a rebuttable presumption that M/V

5

INT'L HUNTER was at fault for the accident because it allided with a stationary object. Linder also asks the court to apply The Pennsylvania Rule against the M/V INT'L HUNTER because Captain Pennington failed to adhere to applicable regulations governing navigation.

### 1. Maritime Negligence

To prevail on a negligence claim under admiralty law, the plaintiff must prove: (1) that the defendant owed it a duty; (2) the defendant breached that duty; (3) the breach was the cause-in-fact and legal cause of plaintiff's damages; and, (4) actual damages. In re Mid-S. Towing Co., 418 F.3d 526, 531 (5th Cir. 2005); see also 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5-2 (2d ed. 1994). In admiralty cases, the standard of care is established by statutes or regulations[4], maritime custom, or by the general principles of negligence law. S.C. Loveland, Inc. v. E. W. Towing, Inc., 608 F.2d 160, 165 (5th Cir. 1979); see also 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 5-2 (2d ed. 1994) ("In admiralty the duty of care may be derived from three basic sources: (1) duly enacted laws, regulations, and rules; (2) custom; and (3) the dictates of reasonableness and prudence."). If "two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault." United States v. Reliable Transfer Co., 95 S.Ct. 1708, 1715-16 (1975).

---

[4] When a statute or regulation "creates a minimum standard of care . . . then an unexcused violation, an act done with less than minimum care," is negligence per se. Dougherty v. Santa Fe Marine, Inc., 698 F.2d 232, 234-35 (5th Cir. 1983) (quoting Lowe v. Gen. Motors Corp., 624 F.2d 1373, 1381 (5th Cir. 1980)). "The failure to follow any Coast Guard regulation which is the cause of an injury establishes negligence per se." Id. at 235 (citing Kernan v. Am. Dredging Co., 78 S.Ct. 394, 401 (1958); Reyes v. Vantage S.S. Co., 609 F.2d 140, 143 (5th Cir. 1980)). However, if the regulation contains an ambiguous or contradictory standard, the common law standard of reasonable care under the circumstances applies. Id.

**2. The Oregon Rule**

There are presumptions and burden-shifting principles that govern the imposition of liability for allisions on navigable waterways. Under The Oregon Rule, it is presumed that a moving vessel is at fault when it allides with a stationary object. The Oregon, 15 S.Ct. 804, 807 (1895). Thus, the owner of a stationary object that is hit by a moving vessel can satisfy its initial burden of demonstrating the breach of a duty on the part of the vessel by invoking The Oregon Rule. Id. "This presumption operates to shift the burden of proof – both the burden of producing evidence and the burden of persuasion – onto the moving ship." Am. Petrofina Pipeline Co. v. M/V SHOKO MARU, 837 F.2d 1324, 1326 (5th Cir. 1988) (citing Delta Transload, Inc. v. M/V NAVIOS COMMANDER, 818 F.2d 445, 449 (5th Cir. 1987); James v. River Parishes Co., Inc., 686 F.2d 1129, 1131-33 (5th Cir. 1982)). The vessel can rebut the presumption by proving, by a preponderance of the evidence, that the stationary object was at fault for the allision, that it acted with reasonable care, or that the allision was an unavoidable accident. Id. (citing Bunge Corp. v. M/V FURNESS BRIDGE, 558 F.2d 790, 795 (5th Cir. 1977); Delta Transload, 818 F.2d at 449; James, 686 F.2d at 1132; Woods v. U.S., Dep't of Transp., 681 F.2d 988, 990 (5th Cir. 1982)). The Oregon Rule "presumption derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way." Id. (citing Delta Transload, 818 F.2d at 449; Bunge, 558 F.2d at 795). As the United States Court of Appeals for the Fifth Circuit explained:

> Such accidents simply do not occur in the ordinary course of things unless the vessel has been mismanaged in some way. It is not sufficient for the respondent to produce witnesses who testify that as soon as the danger became apparent everything possible was done to avoid an accident. The question remains, How then did the collision occur? The answer must be either that, in spite of the testimony of the witnesses, what was done was too little too late, or if not, then the

>vessel was at fault for being in a position in which an unavoidable collision would occur.

Delta Transload, 818 F.2d at 449-50 (quoting Patterson Oil Terminals, Inc. v. THE PORT COVINGTON, 109 F.Supp. 953, 954 (E.D.Pa. 1952)). Although The Oregon Rule presumption of fault does not apply to allisions with sunken and hidden objects, a vessel operator's knowledge of an otherwise nonvisible object warrants the imposition of the presumption, because that knowledge renders the accident "neither fortuitous nor unavoidable." Delta Transload, 818 F.2d at 450.

In this case, the M/V INT'L HUNTER, a moving vessel, allided with WC 168 #2, a stationary object. Although WC 168 #2 was submerged and nonvisible, Captain Pennington admitted at his deposition that he knew about the WC 168 #2's location. Therefore, The Oregon Rule presumption should apply to place the burden of proof regarding fault on International Marine. However, International Marine has offered evidence to rebut the presumption regarding Linder's fault for improperly marking or failing to remove WC 168 #2. Therefore, there are contested issues of material fact that preclude a finding whether International Marine was solely at fault, and Linder's motion for summary judgment is DENIED as to such a finding.

### 3. The Pennsylvania Rule

Under The Pennsylvania Rule, when at the time of a collision, a ship

>is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been.

The Pennsylvania, 86 U.S. 125, 136 (1874).

"Although in its original form the rule of The Pennsylvania applied only to collisions between ships, it has been extended in [the Fifth Circuit] to apply to a variety of maritime accidents and to parties other than vessels." Pennzoil Producing Co. v. Offshore Express, Inc., 943 F.2d 1465, 1472 (5th Cir. 1991) (citations omitted). "Thus, the rule has been reformulated to apply to any 'statutory violator' who is a 'party to a maritime accident.'" Id. (citing Sheridan Transp. Co. v. United States, 834 F.2d 467, 476 (5th Cir. 1987)). The Pennsylvania Rule applies to allisions and "to those who do not properly mark an object in navigable waters." Id. (quoting Gele v. Chevron Oil Co., 574 F.2d 243, 247 (5th Cir. 1978)); see also Trico Marine Assets Inc. v. Diamond B Marine Serv. Inc., 332 F.3d 779, 786 (5th Cir. 2003) (citations omitted).

This presumption allocates the burden of proof regarding causation to the party in violation of the statute.[5] Pennzoil Producing, 943 F.2d at 1472; see also Candies Towing Co., Inc. v. M/V

---

[5] In Mid-S. Towing, 418 F.3d at 531 n. 5, the United States Court of Appeals for the Fifth Circuit explained the relationship between The Oregon Rule and The Pennsylvania Rule:

> It is important to distinguish at the outset between the presumption of *fault* announced in The Oregon and the presumption of *causation* announced in The Pennsylvania; the latter case holding that a vessel in violation of a statutory rule designed to prevent collisions bears the burden of showing "not merely that her fault might not have been one of the causes, or that is probably was not, but that it could not have been." The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873). *Compare* SCHOENBAUM, ADMIRALTY & MARITIME LAW, § 14-3, at 104-05 (classifying the rule of The Oregon as a "presumption of fault" akin to the common law doctrine of res ipsa loquitor "primarily applicable in allision cases," which "creat[es] a rebuttable presumption of *negligence* on the part of a party who is in exclusive control of an instrumentality with regard to a mishap that ordinarily does not occur in the absence of negligence") (emphasis added), *with* id. at § 14-3, at 101 (classifying the rule of The Pennsylvania as not establishing a rule of fault but as being "limited to *causation*") (emphasis added), *and* DAVID W. ROBERTSON ET AL., ADMIRALTY & MARITIME LAW IN THE UNITED STATES 384 (2d ed. 2001) (describing the rule of The Pennsylvania as creating "a strong presumption that the statutory violation was a *cause in fact* of the accident," and distinguishing this rule from the common-law concept of negligence per se famously applied in Martin v. Herzog, 228 N.Y. 164, 126 N.E. 814 (1920) (Cardozo, J.)).

(emphasis in original).

9

B&C ESERMAN, 673 F.2d 91, 93 (5th Cir. 1982) (The Pennsylvania Rule "constitutes an evidentiary rule reversing the burden of proof."). However, The Pennsylvania Rule "is not pressed to literal extremes for it does not go so far as to say that 'every [party] guilty of a statutory fault has the burden of establishing that its fault could not, by any stretch of the imagination, have had a causal relation to the collision, no matter how speculative, improbable or remote.'" Gele, 574 F.2d at 248 (quoting China Union Lines, Ltd. v. A.O. Anderson & Co., 364 F.2d 769, 782 (5th Cir. 1966)). Moreover, the rule cannot "be pressed to such an extreme as to justify a division of damages when the accident was undoubtably due to the negligence of an offending vessel whose actions could not be anticipated." Dow Chem. Co. v. Dixie Carriers, Inc., 463 F.2d 120, 122 n. 5 (5th Cir. 1972) (quoting Webb v. Davis, 236 F.2d 90, 93 (4th Cir. 1956)).

The Pennsylvania Rule "does not fix liability" nor does it "determine a party's ultimate share of the liability for a loss." Pennzoil Producing, 943 F.2d at 1472. "If a party fails to carry the burden imposed on it by the rule, the rule does not require that party to bear 100% of the responsibility for the allision. Liability still must be apportioned according to the comparative fault of the parties." Id.

Linder argues that Captain Pennington's failure to observe federal regulations regarding navigation and the use of bouys was the sole cause of the allision. Linder contends that Captain Pennington violated the following regulations by failing to use a chart to plot a course around WC 168 # 2, and relying on the bouy to avoid it[6]:

---

[6] Linder also cites sections of the U.S. Coast Pilot that Captain Pennington allegedly violated. Because the provisions of the U.S. Coast Pilot are not statutes or federal regulations, they will not be referenced in this analysis of The Pennsylvania Rule.

a. 33 C.F.R. § 62.21(b), which states,

> The U.S. Aids to Navigation System is designed for use with the nautical charts. Nautical charts portray the physical features of the marine environment including soundings and other submarine features, landmarks, and other aids necessary for the proper navigation of a vessel. . . The exact meaning of an aid to navigation may not be clear to the mariner unless the appropriate chart is consulted, as the chart illustrates the relationship of the individual aid to navigation to channel limits, obstructions, hazards to navigation, and to the total aids to navigation system.

b. 33 C.F.R. § 62.21(e), which states,

> Generally, lateral aids to navigation indicate on which side of a vessel an aid to navigation should be passed when the vessel is proceeding in the Conventional Direction of Bouyage. Normally, the Conventional Direction of Bouyage is the direction in which a vessel enters navigable channels from seaward and proceeds towards the head of navigation. In the absence of a route leading from seaward, the Conventional Direction of Bouyage generally follows a clockwise direction around land masses. For example, proceeding southerly along the Atlantic Coast, from Florida to Texas along the Gulf Coast, and northerly along the Pacific Coast are considered as proceeding in the Conventional Direction of Bouyage. In some instances the direction must be arbitrarily assigned. Where doubt exists, the mariner should consult charts and other nautical publications.

c. 33 C.F.R. § 62.23, which explains the use of bouys as aids to navigation, and states,

> \*   \*   \*
>
> (2) Mariners attempting to pass a bouy close aboard risk collision with a yawing bouy, the bouy's mooring, or with the obstruction which the bouy marks.
>
> (3) Mariners should not rely on bouys alone for determining their positions due to factors limiting their reliability. Prudent mariners will use bearings or angles from beacons or other landmarks, soundings, and various methods of electronic navigation. Bouys vary in reliability because:
>
> > (i) Bouy positions represented on nautical charts are approximate positions only, due to practical limitations in positioning and

        maintaining bouys and their sinkers in precise geographical locations.

        (ii) Bouy moorings vary in length. The mooring lengths define a "watch circle", and bouys can be expected to move within this circle. Actual watch circles do not coincide with the dots or circles representing them on charts.

        (iii) Bouy positions are normally verified during periodic maintenance visits. Between visits, environmental conditions, including atmospheric and sea conditions, and seabed slope and composition, may shift bouys off their charted positions. Also bouys may be dragged off station, sunk, or capsized by a collision with a vessel.

d. 33 C.F.R. § 164.11, which states,

        The owner, master, or person in charge of each vessel underway shall ensure that:

        \*      \*      \*

        (c) The position of the vessel at each fix is plotted on a chart of the area and the person directing the movement of the vessel is informed of the vessel's position;

        (d) Electronic and other navigational equipment, external fixed aids to navigation, geographic reference points, and hydrographic contours are used when fixing the vessel's position;

        (e) Bouys alone are not used to fix the vessel's position;

        Note: Bouys are aids to navigation placed in approximate positions to alert the mariner to hazards to navigation or to indicate the orientation of a channel. Bouys may not maintain an exact position because strong or varying currents, heavy seas, ice, and collisions with vessels can move or sink them or set them adrift. Although bouys may corroborate a position fixed by other means, bouys cannot be used to fix a position: however, if no other aids are available, bouys alone may be used to establish an estimated position.

International Marine argues that Linder's failure to comply with regulations regarding the marking and removal of WC 168 #2 was the sole cause of the allision.[7] Those regulations include:

a. 33 C.F.R. § 64.11, which states,

> (a) The owner of a vessel, raft, or other craft wrecked and sunk in a navigable channel shall mark it immediately with a buoy or daymark during the day and with a light at night. The owner of a sunken vessel, raft, or other obstruction that otherwise constitutes a hazard to navigation shall mark it in accordance with this subchapter.
>
> (b) Owners of vessels sunk in waters subject to the jurisdiction of the United States or sunk on the high seas, if the owner is subject to the jurisdiction of the United States, shall promptly report to the District Commander, in whose jurisdiction the obstruction is located, the action they are taking to mark the sunken vessel, giving the following information (in addition to the information required by 46 CFR 4.05, Notice of Marine Casualty and Voyage Records):
>
>> (1) Name and description of the sunken vessel;
>>
>> (2) Accurate description of the location of the vessel;
>>
>> (3) Depth of water over the vessel; and
>>
>> (4) Location and type of marking established, including color and shape of buoy or other daymark and characteristic of the light.
>
> (c) Owners of other obstructions may report the existence of such obstructions and mark them in the same manner as prescribed for sunken vessels.

b. 33 C.F.R. § 64.13(a), which states,

> All markings of sunken vessels and other obstructions established in accordance with § 64.11 must be reported to and approved by the appropriate District Commander.

---

[7] International Marine also cites jurisprudence regarding the distance of bouys from the obstructions they mark to demonstrate that Linder placed the bouy too far from WC 168 #2. However, there is no statute or regulation governing the distance a bouy should be placed from the obstruction it marks. The cited jurisprudence more accurately supports an argument regarding the reasonableness of the distance of the bouy from WC 168 #2, not that a specific distance invokes The Pennsylvania Rule.

    c. 30 C.F.R. § 250.1703, which states that when an offshore oil platform is no longer useful the owner must,

> (a) Get approval from the appropriate District Manager before decommissioning wells and from the Regional Supervisor before decommissioning platforms and pipelines or other facilities;
>
> (b) Permanently plug all wells;
>
> (c) Remove all platforms and other facilities, except as provided in §§ 250.1725(a) and 250.1730.

Both Linder and International Marine have presented evidence that the other failed to comply with applicable regulations. Under The Pennsylvania Rule, the statutory violations of both Linder and International Marine would be presumed to be the causes of the allision, and both parties would have the burden of proof to demonstrate by a preponderance of the evidence that its fault could not have been a cause of the allision. The facts in this record do not provide sufficient information to permit a finding of causation for the allision. Therefore, Linder's and International Marine's motions for summary judgment are DENIED as to a finding that the other party's alleged statutory violations were the cause of the allision.

### 4. Evidentiary Presumptions and Evidence

As stated above, The Oregon Rule and The Pennsylvania Rule are evidentiary presumptions, which permit the trier of fact, "in the absence of other evidence, . . . [to] have a solid, . . ., basis" to determine whether a party was negligent or whether the party's actions proximately caused an accident. Rodi Yachts, Inc. v. Nat'l Marine, Inc., 984 F.2d 880, 887 (7th Cir. 1993) Such "[e]videntiary presumptions, . . . , are designed to fill a vacuum. Once evidence is presented, . . ., presumptions become superfluous because the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions." Mid-S. Towing, 418 F.3d at 532 (quoting Rodi

Yachts, 984 F.2d at 887); see also GRIFFIN, THE AMERICAN LAW OF COLLISION, § 25, at 43 ("Such presumptions are, of course, not rules of law or even evidence. They merely express inferences of fact, based on experience and probabilities, and their only effect is to put upon the vessel subject to the presumption the burden of going forward with evidence to show that in the particular case, the inference is unwarranted." "The exact scope and operation of these prima facie presumptions are to cast upon the party against whom they operate, the duty of going forward in argument or evidence, on the particular point to which they relate."). Further, "the method of decision by presumptions could not work in this case, where each party is armed with a presumption," because "[w]hen presumptions clash, they disappear." Rodi Yachts, 984 F.2d at 887.

As discussed above, both parties have presented evidence regarding fault and causation. Therefore, the application of The Oregon Rule and The Pennsylvania Rule is not appropriate. The fact-finder can hear all of the evidence and make the appropriate findings regarding fault and causation. Thus, the parties motions regarding the application of The Oregon Rule and The Pennsylvania Rule are DENIED.

**C.      Limitation of Liability**

"The Limited Liability Act allows a vessel owner to limit its liability for any loss or injury caused by the vessel to the value of the vessel and its [pending] freight." In re Hellenic Inc., 252 F.3d 391, 394 (5th Cir. 2001); 46 U.S.C. § 183(a). Under the Act, a claimant must first establish negligence or unseaworthiness. Id.; 46 U.S.C. § 183(a). The burden then shifts to the vessel owner to prove that the negligence or unseaworthy condition was not within its privity or knowledge. Id.; 46 U.S.C. § 183(a).

The phrase "privity or knowledge" is not defined in the Act. The United States Court of Appeals for the Fifth Circuit has held that privity or knowledge "must turn on the facts of the individual case." Hellenic, 252 F.3d at 395. A shipowner "has privity if he personally participated in the negligent conduct or brought about the unseaworthy condition." Trico Marine Assets, 332 F.3d at 789. If the shipowner is a corporation, "knowledge is judged by what the corporation's managing agents knew or should have known with respect to the conditions or actions likely to cause the loss." Brunet v. United Gas Pipeline Co., 15 F.3d 500, 504 (5th Cir. 1994) (citing Pennzoil Producing, 943 F.2d at 1471). "[P]rivity or knowledge is imputed to the corporation when the employee is an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred." Hellenic, 252 F.3d at 394 (internal quotation and citation omitted). A corporate shipowner "may be deemed to have constructive knowledge if the unseaworthy or negligent condition could have been discovered through the exercise of reasonable diligence." Brister v. A.W.I., Inc., 946 F.2d 350, 356 (5th Cir. 1991)). "[H]owever, the limited liability doctrine is also sensitive to the scope of an owner's control over his agents." Hellenic, 252 F.3d at 396.

Linder argues that International Marine cannot be exonerated from or permitted to limit its liability because Captain Pennington was incompetent, International Marine failed to train him on federal navigation regulations and publications, and that International Marine failed to test Captain Pennington or observe him while he was navigating in the oil field in the Gulf of Mexico. Linder contends that International Marine should have done more to investigate Captain Pennington's competence as a vessel operator.

As pointed out by International Marine, there has been no finding of negligence or unseaworthiness, thus it is premature to determine International Marine's privity or knowledge of such. Accordingly, Linder's motion for partial summary judgment regarding International Marine's petition for exoneration from or limitation of liability is DENIED.

**D.     Gross Negligence**

Linder asks the court to entered summary judgment in its favor finding that it was not grossly negligent. Linder argues that there is no evidence that it acted with "willful, wanton, and reckless indifference" with respect to marking or removing the platform because it complied with the United States Coast Guard's directives and industry standards of placing a large red bouy south of the obstruction, and compiled with BSEE's directives regarding the removal of the toppled platform.[8]

International Marine argues that gross negligence is a fact intensive inquiry, and that it will present evidence at trial regarding the numerous allisions involving WC 168 #2, and Linder's failure to properly mark or remove it to eliminate an obvious hazard to navigation. Bergeron points out that Linder developed a Plugging and Abandonment Procedure for WC 168 #2 in 2006, when it knew that the platform was no longer useful and that it had already been struck by one vessel, but did not remove it until 2012, after there had been more allisions. Bergeron also points out that Biggs testified that WC 168 #2 could have been removed, but that it was not because removing a sunken

---

[8] After the allision at issue in this case, BSEE or its predecessor, BOEMRE, advised Linder that WC 168 # 2 had to be removed within 5 years. Linder removed it after this suit was filed. Section 250.1711, Title 30 of the Code of Federal Regulations provides that BSEE will order the owner of an oil well to permanently plug and abandon it if the well:

>   (a) Poses a hazard to safety or the environment; or
>
>   (b) Is not useful for lease operations and is not capable of oil, gas, or sulpher production in paying quantities.

platform is an expensive undertaking. They argue that Linder's failure to remove WC 168 # 2 before it was ordered to do so by BSEE was grossly negligent because Linder knew WC 168 #2 was useless.

There are clearly disputed issues of material fact regarding whether Linder was grossly negligent. Therefore, Linder's motion for summary judgment on this issue is DENIED.

E.     **Punitive Damages and Loss of Consortium**

Linder argues that the Williams and Elliot cannot maintain punitive damages claims or loss of consortium claims against it because seamen's remedies are limited to pecuniary damages.[9]

In Miles v. Apex Marine Corp., 111 S.Ct. 317, 328 (1990), the Supreme Court of the United States held that, "in accordance with the uniform plan of marine tort law Congress created in the [Death on the High Seas Act] and the Jones Act," there is a cause of action for the wrongful death of a seaman under the general maritime law, but loss of society damages are not recoverable in such an action, and lost future earnings are not recoverable in the general maritime law survival action. In Scarborough v. Clemco Indus., 391 F.3d 660, 668 (5th Cir. 2004), the United States Court of Appeals for the Fifth Circuit, applying the Miles "uniformity principal," held that neither a seaman nor his heirs "may recover nonpecuniary damages from non-employer third parties." Punitive damages and damages for loss of consortium are non-pecuniary damages. Wahlstrom v. Kawasaki Heavy Indus., Ltd., 4 F.3d 1084, 1094 (2nd Cir. 1993); Bergen v. F/V ST. PATRICK, 816 F.2d 1345, 1347 (9th Cir. 1987). Therefore, under Scarborough, a seaman and his spouse are barred from

---

[9] Linder did not move to dismiss Bergeron's punitive damages claims. Bergeron was a passenger on the M/V INT'L HUNTER at the time of the allision, and is not alleged to be a seaman.

seeking punitive damages and loss of consortium damages from a non-employer third party.[10] Linder's motion for summary judgment is GRANTED as to dismissing the Williams' and Elliot's claims for punitive and loss of consortium damages, and those claims are DISMISSED WITH PREJUDICE.

F.     **Lost Profits and Loss of Use**

Linder argues that International Marine cannot bring a claim against it for loss of profits and loss of use for the M/V INT'L HUNTER because the vessel was a total loss and scrapped as salvage.

When a vessel is rendered a total loss as a result of a marine casualty, "the market value of the vessel is the ceiling of recovery," and damages for loss of use may not be awarded. Gaines Towing and Transp., Inc. v. Atl. Tanker Corp., 191 F.3d 633, 632 (5th Cir. 1999).

In this case, the M/V INT'L HUNTER was a total loss and scrapped as salvage. Therefore, International Marine may not recover loss of use damages from Linder. Linder's motion for summary judgment is GRANTED as to International Marine's claim for loss of use damages, and those claims are DISMISSED WITH PREJUDICE.

---

[10] In Atl. Sounding Co., Inc. v. Townsend, 129 S.Ct. 2561 (2009), the Supreme Court of the United States examined the history of the general maritime law, and found that the Jones Act was not intended to deprive seaman of remedies that they were previously afforded under the general maritime law. The Court held that "because punitive damages have long been an accepted remedy under general maritime law, and because nothing in the Jones Act altered this understanding, such damages for the willful and wanton disregard of the maintenance and cure obligation should remain available in the appropriate case as a matter of general maritime law." Id. at 2575. The Court reasoned that "[l]imiting recovery for maintenance and cure to what is permitted by the Jones Act would give greater pre-emptive effect to the Act than is required by its text, Miles, or any of this Court's other decisions interpreting the statute." Id. The reasoning employed in Townsend casts doubt on the continued applicability of Scarborough. However, Scarborough has not been expressly overruled, and this court "cannot assume that the Fifth Circuit has changed its position on personal injury claims falling outside the scope of Townsend." In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20, 2010, 2011 WL 4575696, at *11 (E.D. La. 10/4/11) (Barbier, J.).

**CONCLUSION**

**IT IS HEREBY ORDERED** that the Motion for Partial Summary Judgment filed by International Marine (Doc. #59) is **DENIED**.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment filed by Linder (Doc. #75) is **GRANTED** as to the punitive damages and loss of consortium claims filed by Lorenzo and Venita Williams and Benjamin Elliot, and the loss of use claims filed by International Marine, and those claims are **DISMISSED WITH PREJUDICE**. The motion is otherwise **DENIED**.

New Orleans, Louisiana, this __26th__ day of June, 2013.

_____
**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**